***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications. Plaintiff withdrew her Motion to Include Additional Records and Remand for Purpose of Taking Medical Depositions.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer on October 6, 2000.
3. Defendant-employer was at all relevant times, duly qualified and self-insured with Sedgwick CMS as its servicing agent.
4. Plaintiff's average weekly wage was $506.03 which yielded a compensation rate of $337.37.
5. Plaintiff sustained an admittedly compensable injury by accident on or about October 6, 2000 with defendant-employer filing a Form 60.
6. Plaintiff's medical records were marked as Stipulated Exhibit #1 and admitted into evidence.
7. The Industrial Commission Forms filed in this case were marked as Stipulated Exhibit #2 and admitted into evidence.
8. Plaintiff was paid temporary total disability benefits from October 11, 2000, through October 16, 2000, and then again from October 18, 2000, through October 26, 2000.
9. The issue to be determined is whether plaintiff is entitled to further compensation benefits.
 ***********
Based on all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. On Friday, October 6, 2000, plaintiff was working for defendant-employer as a dryer feeder. Plaintiff was feeding wood into a wood dryer when a pile of wood fell striking plaintiff on the left thigh and knee area. Plaintiff did not seek immediate medical attention. Plaintiff was not scheduled to work on Monday, October 9, or Tuesday, October 10, however, she did come into work on Monday, October 9, 2000 requesting to see a physician. On October 9, 2000, defendant-employer sent plaintiff to the Mount Olive Family Medicine Center where she was seen and examined. She was diagnosed with a hematoma to the left knee. Plaintiff was not scheduled to work the following two (2) days and was placed on light duty.
2. Plaintiff did not return to work on October 11, 2000 but called and said she still needed to see a doctor. Plaintiff was seen and examined again by Mount Olive Family Medicine Center. This time she was taken out of work through the 16th of October 2001.
3. Plaintiff returned to Mount Olive Family Medicine Center on October 16, 2000 at which time she was placed on light duty. Plaintiff returned to work and worked on October 17, 2000, but did not return on October 18, 2000.
4. Plaintiff did not feel she was any better and sought treatment on her own with Dr. Tin Le at MedStat in Goldsboro, North Carolina. Dr. Le prescribed pain medication and referred plaintiff to Dr. William DeAraujo at Goldsboro Orthopedics Associates.
5. Plaintiff was then seen again on October 23, 2000 and October 24, 2000 at Mount Olive Family Medicine Center. It was recommended that she remain on light duty.
6. Plaintiff was seen by Dr. William DeAraujo on October 25, 2000, who had an impression of left knee medial meniscal symptoms. Plaintiff was placed on light duty. Defendant-employer agreed to the evaluation and did, in fact, pay for the care of Dr. DeAraujo.
7. Plaintiff returned to light duty work on October 27, 2000. Plaintiff then worked light duty from October 27, 2000, through March 23, 2001.
8. On January 19, 2001, plaintiff was seen by Dr. Harrison Latimer of the Kinston Orthopedics and Sports Medicine Center for a second opinion at the request of Dr. DeAraujo. Dr. Latimer's impressions were as follows:
a. Left knee pain with no objective evidence to support her hyper-exaggerated pain response.
b. Concern over Lortab addiction, the patient is on 4 Lortabs a day now three months after her injury.
9. Dr. Latimer recommended that she return to see Dr. DeAraujo for her care and disposition. He had nothing further to add to her care. Dr. Latimer found that plaintiff's knee was completely stable to the anterior, posterior, barus and valgus stresses, that she was neurovascularly intact and had no infusion. Plaintiff returned to the care of Dr. William DeAraujo.
10. By March 23, 2001 plaintiff was released by Dr. William DeAraujo, with the suggestion of no climbing ladders or excessive climbing. Plaintiff had been found to have reached maximum medical improvement.
11. At the time of her release on March 23, 2001, plaintiff was provided a 0% permanent partial impairment rating of the left knee and was working her regular job.
12. On April 5, 2001, plaintiff went on her own to see her family physician, Dr. Dugan, who recommended work restrictions and gave plaintiff a note to that effect. Plaintiff worked her regular job April 5, 2001, and on April 6, took the note to her supervisor who allowed plaintiff to work within the restrictions on April 6, 2001.
13. Plaintiff was returned to working her regular job, and Dr. DeAraujo approved the description of plaintiff's regular job as a dryer feeder on April 10, 2001.
14. Plaintiff then made an appointment on her own with Dr. Rudolph Maier. Plaintiff advised defendant-employer of the appointment with Dr. Meier on April 12, 2001. The employer declined to authorize the appointment. Plaintiff was, instead, told that she could return to see Dr. William DeAraujo.
15. Plaintiff returned to see Dr. William DeAraujo on May 9, 2001, at which time he again reiterated that he had "released her back to work which I cannot keep her out of work at this point."
16. Plaintiff went on her own to see Dr. Maier April 12, 2001, putting the medical expense on her group health insurance. As of May 23, 2001, Dr Maier felt plaintiff "may return to her usual occupation", but suggest restricted work hours and that this restriction remain in effect for two (2) months. Plaintiff did not return to work. Plaintiff remained out of work from April 7, 2001, through July 23, 2001, at which time she returned to work at her regular job and hours.
17. On September 13, 2001, plaintiff returned to see Dr. DeAraujo at which time he noted that she reported having re-injured her left knee on September 5, 2001 and was having more pain. Dr. DeAraujo felt that perhaps that she had a knee contusion and recommended that she take Relafen, "continue her work", and return in four (4) weeks.
18. In his deposition, Dr. DeAraujo testified plaintiff could return to her regular work as of the September 13, 2001 visit. Dr. DeAraujo indicated he would like to see plaintiff back in four (4) weeks. Plaintiff did not return to see Dr DeAraujo. Dr. DeAraujo further testified that a bone scan might be beneficial to determine whether there was any specific problem. Dr. DeAraujo did not diagnose fibromyalgia as a result of the work injury of October 6, 2000. Plaintiff continued working throughout the balance of 2001. In 2002, plaintiff missed work on January 5, 6, 7 and then took herself out of work altogether on April 9, 2002 for reasons unrelated to her knee injury.
19. At the hearing before the deputy commissioner in this matter on October 9, 2002, in New Bern, North Carolina, plaintiff requested to see yet another physician. Plaintiff indicated that she would like to see Dr. Cara Siegel of the Raleigh Orthopedic Clinic. On October 29, 2002, Dr. Siegel declined to see plaintiff.
20. Plaintiff then chose to see Dr. Robert Martin of Carolina Regional Orthopedics. Dr. Martin evaluated plaintiff on December 16, 2002. Dr. Martin's impression was that plaintiff did not have "any objective findings on physical exam that would lead me to believe that patient has a specific ligament or meniscal injury to left knee." Dr. Martin further opined that he did not see any evidence to support a diagnosis of osteoarthritis nor its relation to plaintiff's compensable injury by accident of October 6, 2000.
21. Nevertheless, Dr. Martin recommended a bone scan to "clarify the issue of osteoarthritis and possibly any overlooked injury to the left knee." Dr. Martin felt plaintiff should remain out of work until the bone scan was completed.
22. Plaintiff then underwent a bone scan at Nash General Hospital on January 3, 2003. Dr. Robert Martin then reviewed the results of the bone scan.
23. On January 20, 2003, Dr. Martin released plaintiff to return to normal work at Georgia Pacific as a dryer feeder and approved a job analysis of plaintiff's job as a dryer feeder.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 6, 2000, plaintiff sustained a compensable injury by accident in the course and scope of her employment with defendant-employer, which resulted in injury to her left knee. N.C. Gen. Stat. § 97-2(6).
2. As a result of her injury by accident to her left knee, plaintiff was temporarily totally disabled from December 16, 2002 through January 20, 2003, and is entitled to temporary total disability compensation at the rate of $337.37 per week from December 16, 2002 through January 20, 2003. N.C. Gen. Stat. §97-29.
3. As a result of her injury by accident, plaintiff retains no permanent partial impairment of the left leg or foot or the back. Further, the evidence does not support plaintiff's contention that plaintiff suffers from fibromyalgia or osteoarthritis as a result of her compensable injury by accident of October 6, 2000. Therefore, she is not entitled to compensation for further temporary total or permanent partial disability compensation. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to the payment of all medical expenses incurred as a result of the injury by accident to her left knee so long as it tended to affect a cure or give relief. The care provided by Dr. Rudolph Maier was not authorized and did not provide relief. N.C. Gen. Stat. § 97-25.
5. Pursuant to N.C. Gen. Stat. § 97-25, an injured employee may select a physician of (her) own choosing to attend, prescribe and assume the care and charge of (her) case, subject to the approval of the Industrial Commission. In the event plaintiff seeks to change her treating physician, she must make the request for approval of the Commission within a reasonable time and there must be competent evidence that the treatment was required to provide relief, effect a cure or lessen her period of disability. Thus, plaintiff is not entitled to have defendants pay for unauthorized medical prescriptions, treatment or travel.Schofield v. Great Atlantic and Pacific Tea Co., 299 N.C. 582,264 S.E.2d 56 (1980)
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at a rate of $337.37 per week from December 16, 2002 through January 20, 2003.
2. Defendants shall pay all reasonable and necessary medical expenses incurred for treatment of plaintiff's left knee injury, which are causally related to plaintiff's compensable injury, after said expenses have been approved by the Industrial Commission. Defendants are not obligated to pay for unauthorized care.
3. Defendants shall pay the costs.
This the 27th day of April 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER